# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**TEREZ L. COOK,**

    **Petitioner,**

    **v.**                           **Case No. 13-CV-989**

**WILLIAM POLLARD,**

    **Respondent.**

---

## DECISION AND ORDER DENYING PETITION FOR
## WRIT OF HABEAS CORPUS

---

Terez Cook, a prisoner in Wisconsin custody, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Cook was convicted of armed robbery, armed burglary, three counts of false imprisonment, battery, theft, and mistreatment of an animal causing death, all as party-to-the-crime and as a repeat offender. Cook was sentenced to forty years imprisonment followed by eighteen years of extended supervision. (Habeas Pet. at 2, Docket # 1.) Cook alleges that his conviction and sentence are unconstitutional. For the reasons stated below, the petition for writ of habeas corpus will be denied and the case dismissed.

## BACKGROUND

A Marinette County jury found Cook guilty on January 27, 2006 of armed robbery, armed burglary, three counts of false imprisonment, battery, theft, and mistreatment of an animal causing death, all as party-to-the-crime and as a repeat offender. (Habeas Pet. at 2.) Cook received sentences totaling fifty-eight years, consisting of forty years of initial confinement in prison and eighteen years of extended supervision. A judgment of conviction was entered on March 31, 2006. (Answer, Exh. A, Docket # 36-1.)

The convictions stem from allegations that Cook participated in an armed home invasion. (*State v. Cook*, 2010AP3143 (Wis. Ct. App. Mar. 27, 2012), Answer, Ex. B at 2, Docket # 36-2.) The relevant facts are taken from the decision of the Wisconsin Court of Appeals. Two armed men, one armed with a hand gun, apparently believing rumors that a large quantity of marijuana could be found at the Harper residence in Peshtigo, entered the house, battered Jimmy Harper, shot the family dog, bound Jimmy, Margaret, and Molly Harper with duct tape, and stole Sony speakers belonging to Justin Harper. (*Id.*) Jimmy and Margaret Harper could not describe the assailants; however, their daughter, Molly, provided a general description stating that she believed the assailants were two black men. (*Id.*)

When the assailants left the Harper residence, they ran the car into the ditch. (*Id.*) The police determined that the car was related to the home invasion when they found the speakers in the car. (*Id.* at 2-3.) The police determined that the car belonged to Ashley Sadowski and when officers questioned Sadowski and her friend, Jessica Babic, the women admitted their roles in the crimes. (*Id.* at 3.) Sadowski and Babic admitted they went to a Walmart store with John Egerson and his friend, who was only introduced by the nicknames "Rex" and "BN." (*Id.*) The women bought gloves, bandanas, and duct tape. (*Id.*) The women then drove Egerson's car to the Harper residence with the men following in Sadowski's car. (*Id.*) The men gave the women Egerson's cell phone and one of his accomplice's cell phones. (*Id.*) "Rex" kept his other cell phone to call the women when they were finished. (*Id.*) The women then drove to a park and waited for the men to contact them. (*Id.*) The men ran Sadowski's car into the ditch and they called the women to take them from the scene. (*Id.*)

The police learned of the cell phone calls and discovered that the calls came from a phone owned by Stacy Thede, who told the police that she purchased the phone for her boyfriend, Terez Cook. (*Id.*) Cook, who was present at Thede's apartment, was taken into custody. (*Id.*) The detectives showed Cook's picture to Sadowski and Babic and they identified him as Egerson's accomplice in the home invasion. (*Id.*) The detectives also took a DNA swab that matched the DNA found on a cigarette in Sadowski's car. (*Id.*) Cook eventually admitted that he was in Peshtigo and was with Egerson, Sadowski, and Babic at the Walmart and after the home invasion, but denied being the fourth perpetrator. (*Id.*)

At trial, Sadowski and Babic both identified Cook as the other home invader. (*Id.* at 4.) Margaret Harper also testified that she recognized Cook when she saw him on the morning of trial because she had a "flashback" and recognized him as one of the assailants by his eyes. (*Id.*)

Cook's defense was that another individual, David Hall, not Cook, was Egerson's accomplice in the home invasion. (*Id.*) Cook's attorney showed the jury a picture of Hall to demonstrate his similarities to Cook. (*Id.*) Babic testified that Hall did not know about the plan to rob the Harpers and that she did not see him with a gun that night when he went to her house about two hours before the robbery to pick up some movies. (*Id.*) When Cook's attorney asked Sadowski on re-cross examination whether Hall had a gun that night of the burglary, the government objected on the ground that the issue was not brought up on re-direct and Cook's attorney withdrew the question. (*Id.*)

After his conviction, Cook filed a direct appeal. The Wisconsin Court of Appeals affirmed his conviction on July 29, 2008. (*State v. Cook*, 2007AP521 (Wis. Ct. App. July 29,

2008), Exh. to Habeas Petition, Docket # 1-1.) The Wisconsin Supreme Court denied review. Cook subsequently filed a Wis. Stat. § 974.06 motion for postconviction relief in the circuit court collaterally attacking his conviction on the grounds of ineffective assistance of trial counsel. (Docket # 62-7.) An evidentiary hearing was held. At the hearing, Sadowski testified that Hall often carried a gun, but she did not see him with a gun at Babic's house that night. (Docket # 36-2 at 4.) Hall testified at the hearing and admitted to being at Babic's home, but denied having a gun or knowing anything about the home invasion. (*Id.*) He admitted to knowing Egerson and testified that he picked up the women the next day when they called him for a ride. (*Id.*) Hall testified that he never went to the Harper home with Sadowski prior to the burglary, contradicting Sadowski's testimony that they had gone to the Harper home on previous occasions to look the place over because of the rumor that there was $30,000 worth of marijuana in the Harpers' garage. (*Id.*)

The trial court granted collateral relief and ordered a new trial on October 29, 2010 after determining that trial counsel was ineffective in several respects. (Exh. to Habeas Petition, Docket # 1-1 at 10.) The State of Wisconsin appealed and the court of appeals reversed the order for a new trial in a decision dated March 27, 2012. (Docket # 36-2.) The supreme court denied review on September 27, 2012. (Docket # 36-3.)

Cook filed a petition for federal habeas corpus on August 15, 2013, raising four grounds for relief: a due process violation based on the Wisconsin Court of Appeals reversing the trial court's grant of a new trial; ineffective assistance of trial counsel; newly discovered evidence; and ineffective assistance of post-conviction and appellate counsel. (Docket # 1.) Cook's habeas proceedings were stayed on February 13, 2014 so that Cook

could exhaust his state court remedies with respect to his newly-discovered evidence claim. (Docket # 11.) The stay was lifted on February 13, 2015 and the respondent subsequently filed a motion to dismiss on the grounds that the petition was untimely. (Docket # 29.) I denied the respondent's motion on August 5, 2015 and ordered the respondent to file an answer and the parties to brief the petition. (Docket # 35.)

## STANDARD OF REVIEW

Cook's petition is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Under AEDPA, a writ of habeas corpus may be granted if the state court decision on the merits of the petitioner's claim (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d) (1); or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).

A state court's decision is "contrary to . . . clearly established Federal law as established by the United States Supreme Court" if it is "substantially different from relevant [Supreme Court] precedent." *Washington v. Smith*, 219 F.3d 620, 628 (7th Cir. 2000) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). The court of appeals for this circuit recognized the narrow application of the "contrary to" clause:

> [U]nder the "contrary to" clause of § 2254(d)(1), [a court] could grant a writ of habeas corpus . . . where the state court applied a rule that contradicts the governing law as expounded in Supreme Court cases or where the state court confronts facts materially indistinguishable from a Supreme Court case and nevertheless arrives at a different result.

*Washington*, 219 F.3d at 628. The court further explained that the "unreasonable application of" clause was broader and "allows a federal habeas court to grant habeas relief whenever the state court 'unreasonably applied [a clearly established] principle to the facts of the prisoner's case.'" *Id.* (quoting *Williams*, 529 U.S. at 413).

To be unreasonable, a state court ruling must be more than simply "erroneous" and perhaps more than "clearly erroneous." *Hennon v. Cooper*, 109 F.3d 330, 334 (7th Cir. 1997). Under the "unreasonableness" standard, a state court's decision will stand "if it is one of several equally plausible outcomes." *Hall v. Washington*, 106 F.3d 742, 748-49 (7th Cir. 1997). In *Morgan v. Krenke*, the court explained that:

> Unreasonableness is judged by an objective standard, and under the "unreasonable application" clause, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."

232 F.3d 562, 565-66 (7th Cir. 2000) (quoting *Williams*, 529 U.S. at 411), *cert. denied*, 532 U.S. 951 (2001). Accordingly, before a court may issue a writ of habeas corpus, it must determine that the state court decision was both incorrect and unreasonable. *Washington*, 219 F.3d at 627.

## ANALYSIS

Although Cook raises four grounds for relief in his habeas petition, in his briefs in support of the petition, Cook focuses his argument on the first two grounds: (1) that his due process rights were violated when the Wisconsin Court of Appeals reversed the trial court's decision granting him a new trial on a ground not raised by the State on appeal and (2) that

the Wisconsin Court of Appeals' decision reversing the trial court's grant of a new trial based on ineffective assistance of trial counsel was contrary to federal law as determined by the Supreme Court and was based on an unreasonable determination of the facts in light of the evidence presented. I will address each in turn.

1.    *Due Process Violation*

Cook argues that his right to due process of law was violated when the Wisconsin Court of Appeals reversed the decision of the trial court granting Cook a new trial on grounds not raised or briefed by the parties. (Petitioner's Br. at 3, Docket # 43.) Cook argues that on appeal, the government argued that the trial court erred in finding that Cook's post-conviction counsel was ineffective; whereas the court of appeals decided the issue of whether Cook's trial counsel was ineffective. (*Id.* at 25.) Cook argues that because the government did not raise the issue of ineffective assistance of trial counsel, he was denied notice and the ability to be heard on the issue. (*Id.* at 26.)

Cook retained Attorney Milton Childs to represent him on any appeal or post-conviction motions pursuant to Wis. Stat. § 974.02 and § 809.30. (Docket # 36-10 at 7.) As Cook argued in his brief before the trial court asking for a new trial, procedurally, the trial court needed to decide the threshold question of the ineffectiveness of post-conviction counsel before it could reach the issue of ineffectiveness of trial counsel. (*Id.* at 5-6.) Cook noted in his motion that on direct appeal, Attorney Childs raised several claims of ineffective assistance of trial counsel without first raising the claims before the trial court via a Wis. Stat. § 974.02 motion. (*Id.* at 7.) *State v. Escalona-Naranjo*, 185 Wis. 2d 168, 517

N.W.2d 157 (1994) bars a defendant from bringing a Wis. Stat. § 974.06 claim that could have been raised under Wis. Stat. § 974.02.

However, Wis. Stat. § 974.06(4) provides that a defendant may raise a claim if the court finds a "sufficient reason" for why the claim was not previously asserted. Cook argued to the trial court that Attorney Childs' failure to file a post-conviction motion on the ineffective assistance of trial counsel prior to raising the issue on appeal was sufficient grounds to allow the court to consider the issue. In other words, Childs' ineffective assistance excused the *Escalona* bar. Cook alternatively argued that if the court found that Childs' failure to file a postconviction motion did not excuse the *Escalona* bar, then the court should find that the issues raised by Childs in his appellate brief were significantly less important and less likely to be successful than the issues raised in the § 976.06 motion. (*Id.* at 9-10.)

During the August 30, 2010 *Machner* hearing, the trial court stated that Attorney Childs was "highly ineffective" because "we're having a hearing right now that should have been held three and a half years ago"; thus, the court stated that it was "automatic that [Childs] did not know how to present the ineffective assistance of counsel issue and have a *Machner* hearing to be able to adequately take those issues to the Court of Appeals." (Transcript of Aug. 30, 2010 *Machner*[1] hearing at 208-209, Docket # 62-8.) The trial court asked the State whether it agreed and the State responded that it had not considered the issue and would not concede it. (*Id.* at 209.)

---

[1] *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (1979).

At the October 29, 2010 *Machner* hearing, the State did not dispute the ineffectiveness of post-conviction/appellate counsel, stating "As to Mr. Childs, I agree with you, we should have been doing the ineffective assistance of counsel motion several years ago." (Transcript of Oct. 29, 2010 *Machner* hearing at 144, Docket # 62-10.) The trial court reiterated that Attorney Childs should have filed a motion raising ineffective assistance of trial counsel years before and noted that counsel "put us in a very bad position," and then went on to address the ineffective assistance of trial counsel issue. (*Id.* at 144-45.) Thus, meeting the threshold requirement, the trial court went on to address the underlying issue of the ineffective assistance of trial counsel.

In its brief before the court of appeals, the State challenged the trial court's finding that Attorney Childs was ineffective, but also challenged the six grounds on which the trial court found trial counsel's performance deficient. (Docket # 36-4 at 18-46.) Similarly, Cook, in his brief before the court of appeals, addressed the issue of trial counsel's ineffectiveness. (Docket # 36-5 at 37-48.)

In its decision, the court of appeals did not address the trial court's finding that Attorney Childs was ineffective and instead addressed the six ways the trial court found that trial counsel was ineffective. (Docket # 36-2 at 1-2.) While Cook argues that the State's framing of the issue prevented him from properly briefing the issue, the State did, in fact, brief the ineffectiveness of trial counsel issue and Cook did, in fact, respond to the argument. Thus, I do not find Cook was denied due process. Further, to the extent that Cook argues that Attorney Childs was ineffective for failing to raise the ineffectiveness of trial counsel, because, as further discussed below, I do not find Cook is entitled to relief on

9

his claim of ineffective assistance of trial counsel, it follows that Cook was not prejudiced by Attorney Childs' failure to challenge trial counsel's performance. *See Warren v. Baenen*, 712 F.3d 1090, 1105 (7th Cir. 2013); *Johnson v. Thurmer*, 624 F.3d 786, 793 (7th Cir. 2010) ("Because [petitioner's] appellate counsel claim is predicated on trial counsel's errors, the two claims rise and fall together."). Thus, Cook is not entitled to habeas relief on this ground.

### 2. *Ineffective Assistance of Counsel*

The heart of Cook's claim for habeas relief is that his trial counsel, Attorney Alf Langan, was ineffective. As an initial matter, Cook argues that the court of appeals violated *Strickland v. Washington*, 466 U.S. 668 (1984) by failing to properly defer to the trial court's factual findings. Cook argues that Wisconsin law requires the Wisconsin Court of Appeals to defer to the trial court's findings of fact unless the findings of fact are clearly erroneous. (Petitioner's Amended Reply Brief, Docket # 61.) This is not an argument that the court of appeals misapplied *Strickland*; rather, it is an argument that the court of appeals applied the wrong standard of review. To the extent Cook argues that the court of appeals applied the wrong standard of appellate review to his claims, he fails to state a claim for habeas relief. A federal habeas court's power to grant a writ of habeas corpus only extends to errors in the application of federal law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). A state court's alleged failure to properly apply state law or its own procedural rules, even if well-established, is not cognizable on federal habeas review. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975) (state courts are the final arbiters of state law).

However, it also appears that Cook argues that the court of appeals misapplied *Strickland* in overturning the trial court's grant of a new trial. Under *Strickland*, to establish ineffective assistance of counsel, Cook must show both "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." 466 U.S. at 687. To satisfy *Strickland*'s performance prong, the defendant must identify "acts or omissions of counsel that could not be the result of professional judgment." *United States ex rel. Thomas v. O'Leary*, 856 F.2d 1011, 1015 (7th Cir.1988) (citing *Strickland*, 466 U.S. at 690). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (quoting *Strickland*, 466 U.S. at 689). A reviewing court must seek to "evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. We "must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance," *id.*, and "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," *id.* at 690.

To establish prejudice, it is "not enough for the defendant to show that his counsel's errors had some conceivable effect on the outcome of the [trial]." *Hough v. Anderson*, 272 F.3d 878, 891 (7th Cir. 2001). A petitioner must show "that there is a reasonable probability that, but for counsel's errors, the result of the [trial] would have been different." *Strickland*, 466 U.S. at 694. This does not mean that the defendant must show that "counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693. Rather, a "reasonable probability is a probability sufficient to undermine confidence in the outcome."

11

*Id.* at 694. Making this probability determination requires consideration of the totality of the evidence before the jury. *Id.* at 695. A "verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696.

The trial court found six grounds on which trial counsel rendered ineffective assistance. The court of appeals addressed each of the six grounds and held that Cook failed to establish deficient performance and prejudice. I will address each in turn.

### 2.1 Trial Counsel's Failure to Find Hall

As stated above, Cook's position at trial was that Hall, not Cook, was Egerson's accomplice in the home invasion. Babic testified that Hall was at her house earlier on the day of the robbery to borrow movies (Docket # 62-3 at 36) and returned to her house later in the evening, but only stayed for a few minutes (*id.* at 37-39). Babic testified that she did not see Hall again until the next day. (*Id.* at 39.) Sadowski testified that Hall was "no where near" them during the robbery. (Docket # 62-2 at 36.)

Langan was unable to locate Hall prior to trial. The trial court initially found that Langan was not deficient for failing to find Hall because Hall was in absconder status. (Docket # 62-8 at 163-64.) The trial court subsequently reconsidered its ruling and found that Langan was ineffective for failing to discover that Hall was not in prison at the time of the trial and for failing to make a better effort to locate him. (Docket # 62-10 at 124.)

The court of appeals found that although Langan was incorrect when he stated his belief that Hall was in prison and although counsel was unaware of how to locate a prisoner, Cook failed to establish deficient performance in counsel's failure to locate Hall.

The court of appeals considered the fact that Hall was on absconder status at the time of the trial and his probation officer was unable to locate him. (Docket # 36-2 at 6.) The court of appeals further considered the fact that Hall testified at the post-conviction hearing that his family did not know where he was at that time. (*Id.*) The court of appeals found that even though Hall testified that he was not in hiding and continued to live and work at the same places throughout the time in question, it was not unreasonable to believe that Hall could not be found or that, if found, he would refuse to testify. (*Id.* at 6-7.)

The court of appeals' finding that Cook failed to establish deficient performance as to Langan's failure to find Hall before trial is an unreasonable application of *Strickland*. At the time of trial, Langan stated that he thought Hall was in prison, but he did not know which institution. (Transcript of Jan. 26, 2006 Jury Trial at 157, Docket # 62-4.) The trial judge asked Langan "[h]ow hard can that be to find him?" given that Hall was in prison. (*Id.*) Langan responded that "I have been here all day, Judge. I haven't been able to find him." (*Id.*) As was established at the *Machner* hearing, Wisconsin has an inmate locator system that anyone may use to locate a person in prison. (Transcript of June 7, 2010 *Machner* hearing at 5, Docket # 62-7.) Langan testified that he was aware of the inmate locator system and had used it, but he could not remember if he had used it to attempt to locate Hall. (Docket # 62-8 at 50.)

In assessing counsel's investigation, I must conduct an objective review of Langan's performance, measured for "'reasonableness under prevailing professional norms.'" *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (quoting *Strickland*, 466 U.S. at 688). I find that given Langan's belief that Hall was incarcerated, his failure to check the inmate locator system—a

13

well-known and commonly used system in Wisconsin—fell below the standards for reasonable professional judgment. The court of appeals' finding to the contrary is an unreasonable application of *Strickland*.

The court of appeals' finding, however, that Hall was not prejudiced by this error, is not contrary to *Strickland*. *Strickland* requires Cook to demonstrate a reasonable probability that but for Langan's error, the result of the trial would have been different. Had Langan used the inmate locator system, he would have learned that Hall was not, in fact, in prison, but was on absconder status. As the court of appeals stated, neither Hall's probation officer nor his family knew where he was. A warrant was issued for Hall on December 12, 2005, prior to the January 25, 2006 start of trial. (Docket # 62-8 at 161-62.) Hall was not arrested until February 27, 2006, one month after the trial ended. (*Id.*) Thus, the court of appeals' finding that it was not unreasonable to believe that Hall could not have been found or if found, would have refused to testify, is not contrary to or an unreasonable application of *Strickland*.

2.2    Officer's Comment on Cook's Invocation of his *Miranda*[2] Rights

Cook was arrested on May 31, 2005 at the apartment of his girlfriend, Stacy Thede. (Docket # 62-4 at 26, 120.) Cook was initially interviewed by two detectives that day at the Sheboygan Police Department. (*Id.* at 19.) Cook was advised of his constitutional rights and waived those rights and agreed to speak with the detectives. (*Id.* at 20.) During this interview, Cook identified a photograph of Egerson and admitted that he knew him. (*Id.*) Cook denied any knowledge of the robbery or being in Marinette County at the time of the

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

robbery. (*Id.*) Detective Anthony O'Neill testified that he asked Cook biographic questions and completed a form containing this information. (*Id.* at 78.) O'Neill further testified that he asked Cook whether "he wanted to provide a written statement for what he talked about" and Cook "told [him] no." (*Id.*) During the trial, O'Neill was shown Exhibit No. 43, which was the form just described. (*Id.* at 78-79.) O'Neill testified that "at the time [Cook] indicated he didn't want to talk anymore or give a statement, [and] [O'Neill] drew a line there and [O'Neill] wrote refused." (*Id.* at 79.) Both Cook and O'Neill signed the form. (*Id.*) Langan did not object to the admission of Exhibit No. 43 into evidence and it was received. (*Id.*)

The next day, the two detectives transported Cook from the Sheboygan Police Department back to the Marinette County Sheriff's Department. (*Id.* 21.) During this ride, Cook asked whether he was being charged with anything. (*Id.*) Cook was then read his *Miranda* rights, which he agreed to waive. (*Id.*) Cook again asked whether he was being charged with anything, to which the detectives responded that he had not been charged at that time. (*Id.*) During the ride to the Sheriff's Department, the detectives took Cook past several landmarks associated with the robbery, including the Harpers' residence. (*Id.* at 21-22.) However, Cook made no admissions. Upon arrival at the Sheriff's Department, the detectives had a "long conversation" with Cook. (*Id.* at 23.) Cook admitted to being in Marinette County on the night of the robbery and admitted to being at Babic's house that night with Babic, Sadowski, and Egerson. (*Id.*)

The trial court found Langan deficient for failing to object to O'Neill's testimony that "[Cook] indicated he didn't want to talk anymore or give a statement" and Exhibit No. 43.

(Docket # 62-8 at 125.) The trial court found Cook invoked his right to remain silent pursuant to *Miranda* and the jury should not have heard O'Neill's testimony that Cook did not want to talk anymore or give a statement. (*Id.*) Nor should Exhibit No. 43 have been admitted. (*Id.*) The court of appeals found that while the use of a defendant's silence and response to *Miranda* warnings is not allowed, in this case, Cook did not invoke his right to remain silent, as was shown by his discussions with the detectives over a two-day period after being informed of his *Miranda* rights. (Docket # 36-2 at 8.)

The court of appeals further found that even if the jury construed O'Neill's testimony as a statement that Cook refused to speak rather than a refusal to sign a written statement, any adverse inference was minimized by Cook's agreement to speak the next day. (*Id.*) The court of appeals stated that the government did not suggest that any adverse inference should be drawn from Cook's termination of the initial interview and had Langan objected to O'Neill's testimony, O'Neill could have testified that Cook only refused to sign the written statement. (*Id.*) The court of appeals concluded that even if O'Neill's testimony was construed as an invocation of Cook's *Miranda* rights, given the totality of the evidence, it did not affect the verdict.

The court of appeals found that Cook did not invoke his right to remain silent. The court of appeals affectively accepted the government's argument before the trial court that what O'Neill testified to was that Cook refused to sign a written statement, not that he refused to speak. While O'Neill's testimony was in the context of explaining that Cook was refusing to sign a written statement, O'Neill also testified that Cook indicated that he did not want to talk anymore. This statement ended the May 31, 2005 interview. Cook invoked

16

his right to remain silent under *Miranda*. The court of appeals' finding otherwise was an unreasonable determination of the facts in light of the evidence presented. Langan should have objected to O'Neill testimony and requested a curative instruction. His failure to do so fell below the standards for reasonable professional judgment.

The court of appeals also found, however, that even if O'Neill's testimony was construed as an invocation of Cook's right to remain silent, Cook suffered no prejudice from the testimony because the government did not suggest any adverse inference and Cook agreed to speak with the detectives the next day. Cook does not argue that this error alone prejudiced him; rather, he was prejudiced by the totality of trial counsel's errors. (Petitioner's Br. at 7.) I agree that this error, in isolation, does not shake my confidence in the verdict. The government did not focus on or repeat O'Neill's testimony regarding Cook's decision not to speak further with the detectives and Cook initiated contact with the detectives the next day by asking whether he was being charged with anything. Cook then made the incriminating statements regarding his whereabouts on the day of the robbery after again receiving his *Miranda* warnings and agreeing to waive his rights. As such, Cook is not entitled to habeas relief on this ground.

### 2.3 Margaret Harper's In-Court Identification of Cook

Margaret Harper testified that her assailants were wearing masks at the time of the robbery; however, she could see their eyes. (Transcript of Jan. 25, 2006 Jury Trial at 88-89, Docket # 62-2.) She testified that while she was wrestling on the floor with her assailant, her nightstand was knocked over and her touch lamp went on, so there was light "right where I was." (*Id.* at 89.) Margaret Harper further testified that she was able to see that the assailants

were African American because she could "see black around the eyes, dark eyes." (*Id.*) She testified that her assailant was "right in [her] face." (*Id.*)

Deputy Sheriff Randy Miller of the Marinette County Sheriff's Department testified that only Molly Harper was able to provide a description of the assailants, and she gave only the general description that they were black males. (Transcript of Jan. 26, 2006 Jury Trial at 94, Docket # 62-3.) Margaret Harper was unable to identify either of the assailants in police photo arrays before trial. (Docket # 62-7 at 67.) However, on the first day of trial, Margaret Harper testified that she was sitting in the back of the courtroom that morning (the same day she testified) and Cook looked at her when he was leaving the courtroom after jury selection. (Docket # 62-2 at 90.) This exchange caused her to have a "flashback" and she testified that she would "never forget those eyes if [she] ever saw them again." (*Id.*) Langan did not object to Margaret Harper's identification of Cook during trial.

In his closing argument, Langan argued as follows:

> Now, she thinks that she recognizes Terez through his eyes, but listen to her testimony. It was dark in that room that night. She said that the lamp was on only a few feet away from her, yet we don't see it in any of the pictures of the scene. We don't know what lamp was on. How can we know for sure she knew exactly where it was, given everything that was going on. She said everything happened real fast. The man who attacked her that night was screaming at her, in her face screaming, his eyes were bugging out. He was angry, and he's yelling at her and cursing at her. She's looked at several pictures since then, including pictures of Mr. Cook before this trial, but until now, she can't identify anybody.

> Now, indeed I have to suggest that given the racial make up of this area there's a decent possibility that this trial is the closest that she's ever been to a black man since the night of the robbery. She is emotionally fragile, and she is still distraught. I think we all feel bad for her, but you have to ask yourself whether, under all these circumstances, if she is a reliable witness and that she now suddenly recognizes the man who assaulted her, and even if you do

18

believe her, is it enough to persuade you beyond a reasonable doubt in light of everything else that the State has the right man?

(Transcript of Jan. 27, 2006 Jury Trial at 46-47, Docket # 62-5.) At the *Machner* hearing, Langan testified that both he and Cook were surprised by Margaret Harper's identification at trial. (Docket # 62-7 at 70.)

The trial court found Langan's performance deficient in failing to object to Margaret Harper's in-court identification of Cook. (Docket # 62-10 at 147.) The trial court stated that Langan should have asked for a continuance or recess to better prepare for the surprise testimony and found Langan could have made a better presentation to the jury about why the "spontaneous eye identification in court" should not have been accepted. (*Id.*) The trial court further found Langan should have asked for Wis JI—CRIMINAL 141 which addressed identification of a defendant and instructs the jury to consider the reliability of any identification made by a witness, whether in or out of court. (*Id.*)

The court of appeals held that pursuant to *State v. Marshall*, 92 Wis. 2d 101, 284 N.W.2d 592 (1979), which was the law in Wisconsin at the time of Cook's trial, Margaret Harper's in-court identification of Cook was allowed and that much of Cook's argument that the identification should have been excluded relied on changes to the law regarding identification that occurred after Cook's trial. (Docket # 36-2 at 9.) The court of appeals held, citing *Lockhart v. Fretwell*, 506 U.S. 364, 372-73 (1993), that counsel's performance must be judged by the law as it existed at that time. (*Id.*)

The court of appeals further found that the trial court's suggestion that Langan should have requested a jury instruction to give the jury the tools necessary to evaluate the

19

eyewitness identification was not based on the law as it existed at the time of trial. (*Id.*) Finally, the court of appeals held that the trial court's finding that Langan should have requested a continuance would not have accomplished anything and that Langan succeeded in informing the jury that Margaret Harper was unable to pick Cook's picture out of a photo array and the jury had an opportunity to observe Cook's eyes to determine whether they were so unusual that they could provide the basis for identification. (*Id.*)

Cook argues that the court of appeals unreasonably applied *Lockhart* because *Marshall* was not the supreme law of the land, rather the Supreme Court's decisions in *Neil v. Biggers*, 409 U.S. 188 (1972), *Stovall v. Denno*, 388 U.S. 293 (1967), and *United States v. Wade*, 388 U.S. 218 (1967), were the law of the land regarding the reliability of in-court identification. (Petitioner's Br. at 8-9, Petitioner's Reply Br. at 9, Docket # 58.) In other words, Cook argues that *Marshall* contradicts Supreme Court law. But Cook has not shown that the Wisconsin Supreme Court's decision in *Marshall* contradicted any established Supreme Court precedent. In *Marshall*, the prosecution's key witness against the defendant was sitting in the rear of the courtroom when he saw the defendant sitting a few rows in front of him. The witness immediately recognized the defendant as the man he witnessed on the night of the crime and reported this to a police officer. Several days later, a line-up was held and the witness again identified the defendant. The witness had been unable to identify the defendant in photographs shown to him by police prior to trial. 92 Wis. 2d at 109, 284 N.W.2d at 595.

In reviewing the admissibility of the identification, the *Marshall* court distinguished its case from those in *Stovall* and *Biggers* as those cases involved planned confrontations

between a suspect and a supposed witness to a crime orchestrated by the police for the sole purpose of having the witness identify the suspect as the perpetrator of that crime. *Id.* at 117-18, 284 N.W.2d at 599. Whereas in *Marshall*, the identification testimony resulted from an unplanned confrontation between a witness and the defendant. The *Marshall* court noted that the situation before it was significantly different from "show-up" confrontations condemned by the Supreme Court in *Stovall*. The court stated that "[n]o 'show-up' procedure, however, was used here. In fact no identification procedure was being used at all when Cummings first recognized the defendant. The circumstances that did exist were not so suggestive as to encourage misidentification and thereby deprive defendant of due process." *Id.* at 119-20, 284 N.W.2d at 600.

Subsequent to Cook's trial, the Wisconsin Supreme Court in *State v. Hibl*, 2006 WI 52, 290 Wis. 2d 595, 714 N.W.2d 194 questioned whether *Marshall*'s approach—which differentiated an identification resulting from a law enforcement procedure from an accidental one—needed to be modified given the potential for errors in eyewitness identification. However, the *Hibl* court declined to overrule *Marshall*, stating that "we need not and do not modify *Marshall* at this time" and instead scrutinized the eyewitness identification for admissibility under the rules of evidence. 2006 WI 52, ¶ 47.

Cook has not shown that the court of appeals' decision contradicted any established Supreme Court law. Cook is incorrect that *Marshall* runs afoul of *Biggers*. As the Supreme Court more recently articulated in *Perry v. New Hampshire*, 565 U.S. 228, 240-41 (2012), there is a difference between police-arranged identification procedures and cases in which law enforcement officials did not arrange the suggestive circumstances surrounding the

identification. The *Perry* Court held that the "fallibility of eyewitness evidence does not, without the taint of improper state conduct, warrant a due process rule requiring a trial court to screen such evidence for reliability before allowing the jury to assess its creditworthiness." *Id.* at 245.

In Cook's case, law enforcement did not arrange the circumstances in which Margaret Harper identified Cook. Further, Langan argued before the jury that Margaret Harper had not previously identified Cook and called into question her ability to identify him solely by his eyes. Langan also elicited testimony from Sheriff Miller that only Molly Harper was able to give any sort of description of the assailants. Thus, the court of appeals' finding that Langan was not deficient in this respect does not run afoul of *Strickland*. Given this finding, I need not address prejudice as to this claim.

### 2.4    Sadowski and Babic's "De Facto Immunity"

The trial court found Langan's performance deficient in failing to explore the "de facto" immunity granted to Sadowski and Babic and the failure to request an accomplice jury instruction. Although the evidence at trial showed that neither Sadowski nor Babic were formally granted immunity from prosecution for their testimony, the trial court found Langan deficient for failing to explore the "de facto" immunity granted to both witnesses. While Langan questioned Sadowski about her immunity in the presence of the jury, Babic was questioned about her immunity outside the presence of the jury.

Sadowski testified that she knew there was always a possibility that she could get charged with a crime but that she was testifying under the expectation that she would not be

charged. (Docket # 62-2 at 57-58.) Sadowski further testified that no one made any "direct promise" not to charge her, but she was told that she was not getting charged. (*Id.* at 58-59.)

Babic testified that she was told by the officers who arrested her that she would not be charged and that she gave her statements to law enforcement under the belief that she would not be charged. (*Id.* at 56.) Babic testified that she believed she had an agreement with the State that she would not be charged with any crime as a result of her testimony at trial. (*Id.*)

The court of appeals found that Langan's failure to establish Babic's lack of immunity in the presence of the jury was not deficient performance. (Docket # 36-2 at 10.) The court of appeals found that while Langan could have "further fleshed out" Sadowski and Babic's desire to curry favor with the prosecution, there was "no reason to believe the prosecutor insisted on testimony inculpating Cook rather than Hall, and no reason to believe the accomplices would think perjury would ingratiate them with the district attorney." (*Id.*) The court of appeals also stated that further questioning of Sadowski and Babic's desire to curry favor with the prosecution would have run the risk of enhancing their credibility. (*Id.*)

I do not find the court of appeals' determination ran afoul of *Strickland*. Sadowski and Babic were unquestionably the most important witnesses for the prosecution. While Cook admitted to being with Egerson, Sadowski, and Babic on the night of the robbery and while Cook's DNA was found on a cigarette in Sadowki's vehicle, it is the women's testimony that Cook committed the robbery with Egerson that provided the strongest evidence against Cook. While it would have been stronger if Langan had also established

Babic's "de facto immunity" before the jury, Langan did establish the fact that Sadowski believed she would not be charged. Langan also discredited Babic by establishing that she initially lied to law enforcement when questioned about her whereabouts the night of the robbery. (Docket # 62-3 at 36.) Thus, I do not find Langan's failure to question Babic about her "de facto immunity" in the presence of the jury fell below the standards for reasonable professional judgment.

The trial court further found that Langan's performance was deficient in failing to request an accomplice jury instruction. (Docket # 62-8 at 148-49.) The court of appeals found that while the instruction would have been appropriate, it was not necessary. (Docket # 36-2 at 10.) The court of appeals found that the general instruction on witness credibility, Wis JI— CRIMINAL 300 (2000), adequately instructed the jury to consider the witnesses' interest in the result, their bias or prejudice, their motives for falsifying, and all other facts and circumstances that affect credibility. (*Id.*) The accomplice jury instruction Wis JI— CRIMINAL 245 (2000) reads as follows:

> You have heard testimony from (name accomplice) who stated that (he) (she) was involved in the crime charged against the defendant. You should consider this testimony with caution and great care, giving it the weight you believe it is entitled to receive. You should not base a verdict of guilty upon it alone, unless after consideration of all the evidence you are satisfied beyond a reasonable doubt that the defendant is guilty.

The court of appeals' decision as to the accomplice jury instruction is not contrary to *Strickland*. While the accomplice jury instruction certainly would have been appropriate and probably stronger than the general credibility of witnesses jury instruction, the general credibility of witnesses jury instruction does instruct the jury to consider bias, motives for

24

falsifying testimony, and the witnesses' interest in the result of the trial. Wis JI—CRIMINAL 300 (2000). Again, finding no deficient performance, I need not address prejudice.

### 2.5 Testimony Regarding Hall's Possession of a Gun

During Cook's trial, on re-cross examination, Langan asked Sadowski whether it was true that Hall brought a gun to Babic's house the night of the robbery. (Docket # 62-2 at 46.) The prosecutor objected to Langan's question on the ground that it exceeded the scope of re-direct. (*Id.*) Langan then withdrew the question. (*Id.* at 47.) During the *Machner* hearing, Langan testified that he did not remember what he was thinking when he withdrew his question in response to the objection. (Docket # 62-8 at 35.) Counsel argued before the trial court that under Wisconsin law, the scope of cross-examination is not limited to the scope of direct examination, quoting *State v. Lindh*, 161 Wis. 2d 324, 468 N.W.2d 168 (1991), and argued that it follows that the scope of re-cross is not limited to the scope of re-direct. (Docket # 62-8 at 181.) Thus, counsel argued that Langan's performance was deficient because he misapprehended the law. (*Id.* at 183.)

Sadowski testified at the *Machner* hearing that she had seen Hall carry a 9 mm gun "a lot" and that it "[c]ould have been" the same type of gun used in the robbery. (Docket # 62-10 at 40-41.) Sadowski further testified that she did not see Hall with a gun at Babic's house the night of the robbery. (*Id.* at 42, 50-51.)

The trial court found Langan's questioning of Sadowski regarding Hall carrying a gun deficient. The trial court held that Langan simply gave up when the prosecutor objected to his question and had he questioned Sadowski more aggressively, he could have produced

information regarding the fact that Hall regularly carried a gun and in Sadowski's opinion, it matched the gun used during the robbery. (Docket # 62-10 at 150.)

The court of appeals did not specifically address whether Langan's performance in questioning Sadowski about Hall's carrying of a gun was deficient; however, the court found that Cook failed to establish prejudice from Langan's failure to pursue that line of questioning because even if Hall had a gun and even if the gun was used in the home invasion, inculpating Hall did not necessarily exculpate Cook. (Docket # 36-2 at 11.)

It is true that the Wisconsin Supreme Court in *Lindh* stated that "[t]he scope of cross-examination is not limited to the scope of the direct examination." 161 Wis. 2d at 348, 468 N.W.2d at 176. As to the scope of re-examination, the Wisconsin Supreme Court stated in *State v. Cydzik*, 60 Wis. 2d 683, 690, 211 N.W.2d 421, 426 (1973) that the trial court has considerable latitude in determining what is proper re-cross or re-direct examination of a witness. However, in so stating, the *Cydzik* court also noted that "'Reexamination generally should be confined to the scope of the cross-examination and testimony beyond this is properly excluded.'" *Id.* at 690 n.10, 211 N.W.2d at 426 n.10 (quoting 98 C.J.S. Witnesses s. 419b, pages 222, 223).

At the *Machner* hearing, the trial court stated that it would have overruled the objection in the interest of fairness even if it violated a rule because of the importance of the issue of whether Hall carried a gun that night. (Docket # 62-8 at 190.) Because the trial court has broad discretion in determining the proper scope of re-examination, it would not have been an abuse of discretion under Wisconsin law for the trial court to have allowed the questioning. However, it does not follow that Langan's performance was deficient because

he misunderstood the law—he did not. Generally, the scope of re-examination under Wisconsin law is more limited than the scope of cross-examination. Thus, I cannot say Langan's failure to more aggressively pursue this line of questioning fell below the standards for reasonable professional judgment.

Further, the court of appeals' assessment that Cook failed to establish prejudice was not unreasonable. Sadowski testified that she did not remember seeing Hall with a gun at Babic's house the night of the robbery, despite the fact that he carried a gun "a lot." Further, Sadowski did not testify, as the trial court stated, that Hall's gun matched the one used in the robbery; rather, she testified that it "could have been" the same type of gun that was used in the robbery. For these reasons, Cook is not entitled to habeas relief on this ground.

2.6     Hearsay Regarding Phone Records

Sadowski testified that Egerson and Cook had a cell phone that they intended to use to call the two women after the robbery was complete. (Transcript of Jan. 25, 2006 Jury Trial at 111, Docket # 62-1.) Sadowski further testified that the two women had two cell phones with them—one was Egerson's and one was Cook's—and the women were told they would receive a phone call from Egerson on his cellphone. (*Id.*) Sadowski testified that she received a phone call from Egerson around 4:00 a.m. telling her the robbery was done and that something had been shot. (*Id.*) Sadowski testified that she and Babic drove off looking for Egerson and Cook and that she was on the phone with Egerson the entire time she was driving. (*Id.* at 113.)

Detective O'Neill testified that Babic stated that she received a telephone call from Egerson, who was using Cook's phone, after the men were dropped off at the Harpers'

residence. (Docket # 62-4 at 83-84.) O'Neill further testified that he used this information to get Egerson's phone records and determined that the phone Egerson called during the relevant time period (which was in the possession of the two women) belonged to Cook's girlfriend, Stacy Thede. (*Id.* at 84.) O'Neill also testified that he was able to determine the tower hits from the phone records and learned that the call to Sadowski occurred around 4:00 or 4:01 a.m. and hit off a Peshtigo tower on County Y. (*Id.* at 84-85.) Sadowski testified that she received a call from Egerson around 4:00 a.m. stating that "they were done," had crashed her car, and that "something was shot." (Docket # 62-1 at 112.)

Thede testified that she purchased a cellphone for Cook and that Cook told her that the cellphone was either lost or stolen. (Docket # 62-4 at 111-12.) Thede testified that Cook had lost his cellphone prior to the day of the home invasion. (*Id.* at 113.)

The trial court expressed concern regarding the hearsay coming in through O'Neill regarding the cellphone records and tower hits. (Docket # 62-4 at 144.) The court noted that O'Neill was "not an expert on tower hits and all this kind of thing" and could not "just take the stand and say the calls that were made at the critical time in questions [sic] hit some tower right near Peshtigo." (*Id.*) Langan noted that he thought the government was going to introduce the telephone records, but they never did. (*Id.*) The court noted that "I guess hearsay is admissible unless objected to, but I just thought that was an astounding amount of hearsay in there." (*Id.*)

During the *Machner* hearing, Langan testified that he did not object to O'Neill's hearsay testimony because he had reviewed the cellphone records and believed they were authentic. (Docket # 62-7 at 109.) Langan believed that O'Neill testified correctly about the

28

cellphone records and that it would not have changed anything to bring someone in from the cellphone company to testify about the records. (*Id.*) Langan further testified that he believed bringing in someone from the telephone company would have been cumulative and he did not want to bog the jury down and keep the case as simple as possible. (*Id.* at 110.) However, Langan also testified that he believed that had he objected, the judge would have sustained his objection and not allowed O'Neill to testify about the tower hits. (*Id.* at 110-11.) Although Langan testified that he believed the government was going to introduce the records and have a witness who could identify and explain the records, he also acknowledged that the parties exchanged witness lists prior to trial and the government did not have anyone from the cellphone company on its witness list. (*Id.* at 111, 114.)

The trial court found Langan's failure to object to O'Neill's testimony regarding the cell phone tower hits constituted deficient performance. (Docket # 62-10 at 154.) Although Langan testified that he believed the government was going to call a witness to testify about the records, the government had no witness from the telephone company on its witness list. (*Id.* at 157.) The court found that O'Neill was not competent to testify as to the records and explain tower hits. (*Id.* at 155.) The trial court further found that the phone calls were critical evidence because the calls were being made from Cook's girlfriend's phone in the area of the home invasion, right at the time of the home invasion. (*Id.* at 155-56.) The trial court stated that had Langan objected to the hearsay evidence, the court would have sustained the objection and the evidence would not have been admitted. (*Id.* at 155.)

The court of appeals did not specifically address deficient performance, but found that Cook failed to establish prejudice from O'Neill's testimony. (Docket # 36-2 at 12.) The

court of appeals found that the phone calls established that a person using Cook's phone was in Peshtigo at the time of the crime; however, Cook had already admitted as much to the police. (*Id.*) The court of appeals also found that the phone call evidence was not the most damning evidence against Cook; rather, Cook's admission that he was with the other perpetrators at Walmart when the bandanas, gloves, and duct tape used in the crime were purchased; his DNA found in the getaway car; Sadowski and Babic's identification of him as a perpetrator; his failure to account for his whereabouts during the robbery while admitting to being with the other perpetrators before and after the robbery; and his failure to explain why Sadowski and Babic would falsely incriminate him provided stronger evidence of his guilt. (*Id.*)

As stated above, Langan testified that he did not object to O'Neill's hearsay testimony because he had reviewed the cellphone records and believed they were authentic. (Docket # 62-7 at 109.) Langan believed that O'Neill testified correctly about the cellphone records and that it would not have changed anything to bring someone in from the cellphone company to testify about the records. (*Id.*) Langan further testified that he believed bringing in someone from the telephone company would have been cumulative and he did not want to bog the jury down and keep the case as simple as possible. (*Id.* at 110.) Langan also testified that his theory of the case was that Cook's cellphone had been lost or stolen prior to the night of the home invasion and thus it did not matter what the phone records from Thede's phone showed because Cook did not possess the phone. (Docket # 62-8 at 81.) Langan questioned Thede regarding the fact that Cook told her the phone was missing prior to the crime. (*Id.*)

Given the other evidence presented in the case, namely Sadowski and Babic's testimony that Cook was Egerson's accomplice and the men gave the women Cook's cell phone on the night of the robbery, I do not find that Langan's failure to object to Detective O'Neill's testimony could be excused as a matter of trial strategy. The argument that the phone was stolen pales in comparison to the evidence admitted regarding the cell phone tower hits in the vicinity of the robbery near the time of the robbery. This evidence corroborated Sadowski and Babic's testimony that they received a phone call from Egerson around 4:00 a.m. after the robbery took place.

However, the court of appeals' finding that Cook was not prejudiced by this error does not run afoul of *Strickland*. The court of appeals found that while the phone records established that Cook's phone was in Peshtigo at the time of the crime, Cook had already admitted this to the police. Further, the court of appeals considered the strength and totality of the other evidence of Cook's guilt, including his admission that he was at Walmart with the other perpetrators when the tools of the crime were purchased, his DNA found in the get-away car, his accomplices' identification of him as a perpetrator, his inability to explain why Sadowski and Babic would falsely incriminate him, and his failure to account for his whereabouts during the robbery despite the fact that he was with the perpetrators before and after the robbery. Given this evidence against him, I do not find the court of appeals' determination unreasonable.

3.      *Cumulative Effect of Errors*

Cook acknowledges that in isolation, none of Langan's errors prejudiced him. He argues, however, that he was prejudiced by the errors' cumulative effect. Cook is correct

that "even if individual acts or omissions are not so grievous as to merit a finding of incompetence or of prejudice from incompetence, their cumulative effect may be substantial enough to meet the *Strickland* test." *Crisp v. Duckworth*, 743 F.2d 580, 583 (7th Cir. 1984). The court of appeals found that whether considering Langan's errors individually or collectively, Langan's conduct did not undermine the court's confidence in the outcome of the trial. (Docket # 36-2 at 12.)

I do not find that the court of appeals' determination was an unreasonable application of *Strickland*. As stated above, the court of appeals considered the strength and totality of the evidence against Cook in determining that while some of Langan's "decisions and his explanations for his decisions [were] questionable," the errors had "only a conceivable effect on the outcome" of the case. (Docket # 36-2 at 12.) The court of appeals considered that Cook admitted to being in Peshtigo at the time of the crime; admitted to being at Walmart with the other perpetrators when they bought the bandanas, gloves, and duct tape used in the crime; and his DNA was found in the get-away car. Even though Cook admitted he was with the perpetrators before and after the robbery, he could not account for his whereabouts during the robbery. Further, his accomplices, Sadowski and Babic, identified him as a perpetrator. Again, I am not reviewing Cook's case *de novo*. I am bound by AEDPA's deferential constraints. To grant the writ, Cook must show that the court of appeals' decision was both incorrect and unreasonable. *See Washington*, 219 F.3d at 627. Cook has failed to do so. For these reasons, his petition for a writ of habeas corpus is denied.

## CERTIFICATE OF APPEALABILITY

According to Rule 11(a) of the Rules Governing § 2254 Cases, the court must issue or deny a certificate of appealability "when it enters a final order adverse to the applicant." A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make a substantial showing of the denial of a constitutional right, the petitioner must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893, and n.4).

The Marinette County Circuit Court granted Cook a new trial in this case and in so doing, stated that despite being on the bench twenty years, he could not remember ever granting a new trial because of ineffective assistance of counsel. (Docket # 36-4 at 64.) The fact the trial court granted Cook a new trial in this case due to ineffective assistance of counsel demonstrates that reasonable jurists could debate whether the petition should have been resolved in a different manner. Thus, I will grant Cook a certificate of appealability in this case.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the petitioner's petition for a writ of habeas corpus (Docket # 1) be and hereby is **DENIED**.

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED**.

**IT IS ALSO ORDERED** that a certificate of appealability shall issue.

**FINALLY, IT IS ORDERED** that the Clerk of Court enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 17th day of May, 2018.

BY THE COURT:

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge